Memorandum of Decision
On January 29, 1998, the Department of Children and Families (DCF) filed petitions to terminate the parental rights of Luz V. and Carlos A. to their daughter Mildred A., and to terminate the parental rights of Luz V. and Ricardo V. to their daughters Arelis V. and Alma V., and to their son Ricardo V., Jr. A consolidated trial of the termination petitions took place on November 5, 1998. Toward the conclusion of trial, DCF withdrew the termination petitions concerning Mildred A. and Arelis V. based on the verbal agreement of all parties present to transfer guardianship of these two children to their maternal aunt, Mariana V.[2] For the reasons stated below, the Court grants the remaining petitions to terminate parental rights to Alma V. and Ricardo V., Jr. CT Page 13662
FACTS
The Court finds the following facts and credits the following evidence.
A. The Parents
Luz V., the mother, was almost forty-one years old at the time of trial. She was born in Puerto Rico, graduated high school in Boston, and began training as a nurse's aid. Luz has had seven children through at least three partners and has never been legally married. The three children who were not the subject of this case are in their teenage years or early twenties.
The father, Ricardo V., Sr., was thirty-two years old at the time of trial.[3] He graduated high school and has worked steadily since. For the past nine years he has worked as a chef in a local restaurant. He began his relationship with Luz V. approximately twelve years ago and has provided the financial support for Luz and their three children.
The mother began using drugs at or before age twenty-one. She claims that at some point she stopped using drugs for six years. In 1992 and 1993, she was convicted of breach of peace and prostitution, respectively. On December 26, 1993, she gave birth to Alma at thirty weeks gestation. The mother tested positive for cocaine at the time of birth and had had no prenatal care.
On September 2, 1995, Ricardo V., Jr. (hereinafter Ricardo) was born. The mother again had no prenatal care. Ricardo was also premature and he and his mother tested positive for high levels of cocaine. At the time of baby Ricardo's exposure to cocaine, the mother was on probation for a second conviction for prostitution.
Based on these facts, DCF, which had been assisting the family since 1993, obtained an order for temporary custody of five of Luz's children, including Alma and Ricardo. When DCF workers went to pick up the children on September 8, 1995, they discovered an apartment in deplorable condition. Alma had been sleeping in an unsafe, broken crib. There was food, garbage, and debris on the floor in reach of small children. Dirty clothes were piled on the beds and the mattresses were filthy. As a DCF social worker began to leave without finding the children present, the mother threatened the worker with a knife. The mother was arrested, convicted of threatening, and found in CT Page 13663 violation of her probation.
Over the next several years, DCF referred the mother to approximately a dozen substance abuse treatment programs. Despite the fact that the mother was not working and that DCF was apparently providing transportation and paying the tuition for these programs, the mother completed only part of one program. The mother stated on several occasions that she did not need to enroll in substance abuse counseling. On May 4, 1997, however, she tested positive for marijuana and cocaine. On February 13, 1998, the mother failed to appear for a drug test. On other occasions, a DCF worker and one of the foster mothers felt that the mother was under the influence or smelled of alcohol.
Even after the September, 1995 incident, the mother continued to threaten DCF workers who were attempting to help her overcome her problems. On one occasion in 1996, the mother stated that she hated her daughter Arelis. In late 1996, the mother went to visit a hospital where Ricardo was admitted for the flu but, because the mother threatened the hospital staff, she was physically removed from the hospital. On another occasion in 1997, the mother crumpled up her court expectations, which the Court had imposed on March 26, 1996 in adjudicating the children to be neglected, threw them in the garbage, and stated to a DCF worker that she would steal her children back if she had to. Court-ordered psychological evaluations conducted in 1995 and 1998 by Dr. Julia Ramos Grenier revealed that the mother has a schizotypal personality disorder, which means that she shows unusual thinking patterns, beliefs, and behaviors, and difficulty in social interactions. This disorder, especially without psychiatric intervention, could at a minimum impair the mother's ability to respond to her children's needs.
From the time of the children's commitment to DCF in 1995, the parents attended weekly visits with Alma and Ricardo at their foster homes or at DCF offices, although the father's attendance was more regular than the mother's. The parents, especially the mother, did not sustain interest in the children during the visits. The parents repeatedly brought large quantities of junk food to morning visits with the children, despite DCF warnings not to do so and the fact that Ricardo became ill or hyperactive from eating too much. At times the mother would act very inappropriately, such as telling Alma that her father had hit the mother or even, in August, 1997, fondling Ricardo in a highly questionable manner. The mother showed up at Alma's foster home CT Page 13664 on several occasions in the afternoon or evening in an attempt to sell bracelets or other items. Other than two items of clothing given to Ricardo, the parents have not recognized the childrens' birthdays or any other holidays with cards or gifts. Alma has indicated that she does not want to attend visits with her parents and Ricardo has now refused to go altogether.
The father complied with most of the expectations set by the Court in early 1996. Pursuant to the expectations, the father enrolled in parenting classes which, among other things, stressed the importance of having a safe home for the children. The father in fact took additional parenting classes through Catholic Family Services on his own initiative. The father, however, never presented a realistic plan to DCF for return of the children. For a time, the father expressed the desire that the mother have custody of the children while he would provide financial support. His apartment, while now better furnished, remains somewhat in disrepair. Of critical importance, the father still lived with the mother up until the trial.[4] During a home visit on May 6, 1997, however, the father lied to a DCF worker and stated that he was living alone.
On the day before trial, the mother was arrested because of an argument she had with a foster mother. The mother remained in custody on the day of trial. At trial the father testified that the mother can no longer live with him until she completes a drug rehabilitation program and that he has a babysitter who could watch the children while he is at work.
B. The Children
Alma was almost five years old at the time of trial. She has been with her current foster parents for over three years. She has overcome some developmental delays, achieved perfect attendance in preschool, and now enjoys kindergarten. Although her foster mother required a Spanish-speaking interpreter during her testimony, Alma speaks both Spanish and English well.
Alma's foster mother encourages Alma to visit her parents even though Alma does not wish to see them. Alma is attached to her foster mother as a psychological parent. The foster parents love Alma and wish to adopt her.
Ricardo was three years old at the time of trial. He has required a great deal of care from his foster mother, who has CT Page 13665 been with him from infancy. As a baby, Ricardo had fetal alcohol syndrome and asthma. He has had eye surgery and has loss of sight in one eye. He also has had speech and learning delays and a mild loss of hearing. He has received services from Birth to Three and Head Start.
As stated, Ricardo has refused to visit with his natural parents. During the last visit in August, 1998, Ricardo reacted strongly to the father's attempts to discipline him. The parents blame Ricardo's behavior on what the foster home teaches him. But Ricardo's foster mother loves Ricardo and, for that love, she has had to endure frequent insults and false claims from the natural parents that she is taking the children away from them. Ricardo has bonded with his foster mother and loves the three other children who are in the foster home. According to Dr. Grenier, separation of Ricardo or Alma from their foster homes would be detrimental to their best interests because of the relationships that these children have developed.
ADJUDICATION A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112(c)(1).[5] The Court finds that DCF did locate the parents and made reasonable efforts to reunite them with Alma and Ricardo, including provision of visitation, transportation, and an array of social services.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-112(c)(3). General Statutes § 17a-112(c)(3) requires that, with one exception not pertinent here, these grounds must have existed for at least one year unless the Court waives the one year requirement based on the standards set forth in § 17a-112(d).[6] In this adjudicatory phase, the Court is limited to events preceding the filing of the petition or the CT Page 13666 latest amendment. See Practice Book § 33-3(a). The relevant date in this case is thus January 29, 1998.
DCF in this case has alleged the grounds of failure to rehabilitate and lack of an ongoing relationship with regard to both parents of Alma and Ricardo. DCF alleges that these grounds have existed for more than one year. The Court finds that DCF has proven its allegations by clear and convincing evidence.
1. Failure to Rehabilitate
A statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(C). The statute requires the Court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'" In re Luis C.,210 Conn. 157, 167 (1989). The statute, however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In re Jessica M.,49 Conn. App. 229, 240 (1998) (internal citation omitted).
No dispute exists that the Court has previously found the children to have been neglected, thus satisfying a statutory prerequisite. The rest of the statute requires the Court to find whether the facts "encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(C). Because of the requirement that the Court predict what will happen within a "reasonable time" after the filing of the termination petition, it is sensible to conclude that the Court can consider not only the parents' conduct before the filing of the termination petition, but also the conduct occurring after it.
There is probably no better proof of a person's failure to rehabilitate than that person's arrest the day before trial. If any more proof is necessary in the mother's case, it is supplied by her completion of a portion of only one out of a dozen substance abuse treatment programs. Throughout the period in CT Page 13667 question, the mother has exhibited a hostile, unrepentant attitude and remains in denial about her drug problem. She is in no way fit to be a parent.
The failure to rehabilitate allegation against the father presents a slightly different picture. The father has not been as hostile or as resistant as the mother, although the father did fail to cooperate with DCF concerning bringing junk food to visits and was too quick to blame the foster parents for his own lack of relationship with his children.
The father's main failing, however, is that he did not sever his relationship with the mother, given her drug addiction, antisocial behavior, and confrontational personality. Clearly there were no legal ties that bound him, since he was not married to her. It is true, as the father argued in summation, that neither DCF nor the Court specifically advised him to leave the mother. One of the father's court-ordered expectations, however, was to "secure/maintain adequate housing." Given the situation here, the father could not satisfy this expectation as long as the mother was living in his apartment. Further, parenting classes stressed the importance of having a safe home for the children. It is also clear, from the fact that the father falsely denied a relationship with the mother in May, 1997, and then came up with a last minute plan at trial to take the children independently, that the father knew on his own that he must separate from the mother in order to gain custody. The father never did so and never presented a viable plan for doing so. Indeed, for part of the adjudicatory period, the father suggested that the mother have custody of the children. Based on these concerns, the Court finds that DCF has proven that the father has failed to rehabilitate himself to a position where he can play a responsible position in the children's lives.
2. No Ongoing Relationship
The other statutory ground alleged in this case is that there is "no ongoing parent-child relationship, which means the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Stat. § 17a-112(c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child CT Page 13668 either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal(Anonymous), 181 Conn. 638, 645 (1980) (internal citation omitted). "In either case the ultimate question is whether the child has no present memories or feelings for the natural parent." Id. at 646.
The evidence is clear and convincing that neither Alma nor Ricardo has positive feelings for the parents. The parents have had ample opportunity to develop a relationship through weekly visits, but the children now strongly resist attending these visits. The children have bonded to their foster parents who wish to adopt them. The Court accordingly finds that DCF has proven all allegations of lack of an ongoing relationship.
3. One Year Requirement
The Court finds that the statutory grounds supporting the termination of parental rights to the children existed for more than one year prior to filing of the petition. Moreover, the Court can waive the one year requirement if it finds "[f]rom the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child." Conn. Gen. Stat. § 17a-112(d)(1). Based on the discussion that follows of the best interests of the child, the Court waives the one year requirement to the extent necessary to sustain this decision.
DISPOSITION
In the dispositional phase of a termination case, the Court must consider whether the State has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112(c)(2). The Court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The best interests of the children clearly and convincingly require termination of the parental rights of Luz V. and Ricardo V. The mother is clearly a bad influence for these children. The father is not an appropriate resource because the children do not have positive feelings for him and because he still has not presented a viable plan for raising the children independently of CT Page 13669 the mother. Moreover, there is essentially no dispute of Dr. Grenier's testimony that separation of these children from their foster homes would be detrimental to their well-being.
In arriving at a decision, the Court must also consider and make written findings regarding seven factors set out in General Statutes § 17a-112(e). See In re Tabitha P.,39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the Court finds that DCF provided foster care for the children, visitation for both parents, parenting classes for the father, and drug counseling for the mother. These services were relevant to the needs of the parties and were offered in a timely manner.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the Court finds that DCF offered the parents appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
At the time of commitment of the children, the Court approved the following expectations for the parents: (1) keep all appointments set by or with DCF, (2) keep whereabouts known to DCF and your attorney, (3) visit the children as often as DCF permits, (4) participate in appropriate counseling, (5) sign releases as requested, (6), secure/maintain adequate housing and income, and, for the mother, (7) no substance abuse, and (8) no further involvement with the criminal justice system. As detailed above, DCF substantially met its obligation to provide assistance. Based on the foregoing discussion, the Court finds that the mothers' compliance with these expectations was poor and that the father substantially complied with the expectations except for the critical one of securing and maintaining an CT Page 13670 adequate household.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, the children are bonded to their present foster family and are not bonded to their natural parents.
5) The age of the child.
Alma is almost five years old and Ricardo is three years old. They have been in foster care for over three years. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. See In reJuvenile Appeal (83-CD), 189 Conn. 276, 292 (1983). The Appellate Court has observed that "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence in custody cases." In re Alexander V.,25 Conn. App. 741, 748 (1992). Thus it is not in the best interests of the children to keep them in foster care settings that are legally temporary. The children are entitled to the permanency that termination provides.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interests of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the Court finds that Luz V. and Ricardo V. have visited their children but have not recognized any special occasions for them. The parents have not been successful in the efforts they have made (which, in the mother's case have been minimal) to adjust their circumstances or conditions to facilitate reunification. The parents, particularly the mother, have attempted to intimidate and harass the foster parents. CT Page 13671
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As stated above, the parent's difficulties are primarily of their own making. Although both parents required Spanish-speaking interpreters in Court, there was testimony that the parents' inability to speak English was not a barrier to fulfilling the expectations and that the mother was referred to Spanish-speaking service providers whenever possible.
CONCLUSION
Based upon the foregoing findings, the Court determines that it is in the best interest of Alma V. and Ricardo V., Jr. for a termination of parental rights to enter with respect to the mother, Luz V., and the father, Ricardo V. Accordingly, the Court hereby terminates all parental rights. The Court further orders that the Commissioner of DCF is appointed statutory parent for these children for the purpose of securing an adoptive family. If the foster parents are willing to adopt, it is the Court's direction that they receive first consideration. The Commissioner shall file with this Court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
Carl J. Schuman Judge, Superior Court
[2] Carlos A. did not appear for trial. His whereabouts have been unknown since 1993, despite reasonable efforts to locate him.
[3] The father has a different last name than the mother's and, as stated, is not married to her.
[4] DCF in fact visited the apartment the day before trial to arrange transportation of the parents to court.
[5] The Court need not make such a finding, however, "if a CT Page 13672 court has determined at a hearing pursuant to subsection (b) of section 17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id. DCF concedes that in this case no prior finding formally entered.
[6] Effective July 1, 1998, section 8 of Public Act No. 98-241
eliminates the one year requirement. DCF does not claim reliance on this amendment, apparently because of concerns that a substantive change in the law should not apply retroactively to a petitions, such as the petitions here, filed before the effective date of the new law.
CT Page 13673